**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 22-cr-208-RMR

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     JOSE GALIANO,
            *a/k/a* JOSE GALIANO APAZA,

      Defendant.

---

**MOTION TO SUPRESS GOVERNMENT'S EXHIBITS
INV_00000410, INV_00000427, INV_00000428, INV_00000429, INV_00000430,
INV_00000431, INV_00000432, INV_00000363-409, AND SIMILAR EVIDENCE**

---

Defendant Jose Galiano Apaza ("Defendant"), by and through counsel, Mark Edward Scabavea of SCABAVEA & ASSOCAIATES, LLC, respectfully moves this Honorable Court to suppress Government's Exhibits INV[1]_00000410, INV_00000427, INV_00000428, INV_00000429, INV_00000430, INV_00000431, INV_00000432, INV_00000363-409, similar evidence, evidence referring to that evidence, evidence deriving from that evidence, and any testimony regarding the aforementioned evidence based upon a *Miranda* violation.  In support of said Motion, Defendant states as follows:

---

[1] "INV" is the Government's discovery disclosure to Defendant which are included and conventionally included in this submission.

## I.  CONFERRAL

On October 24, 2022, undersigned counsel conferred with the Assistant United States Attorneys Thomas Minser and Albert Buchman via email.  This motion is *opposed*.

## II.  FACTUAL BACKGROUND

Defendant was coerced into having an interview with OSI.  Defendant's commanding officer, Lieutenant Colonel Amanda Patton, told Defendant that OSI wanted to interview him.  Lieutenant Colonel Patton told Defendant that it was optional for Defendant to go to the interview but *recommended that Defendant go to the interview*.  Lieutenant Colonel Patton knew that the purpose of the OSI interview was to obtain a confession from Defendant.  It is common knowledge in the military context, especially at USAFA, that if a Cadet's commanding officer "recommends" a Cadet to do something, that it really means that the Cadet is *directed* to do that recommendation.  In other words, by recommending to Defendant that Defendant go to the OSI interview, Lieutenant Colonel Patton was directing Defendant to go to the interview - - Defendant really had no choice especially in light of the fact that Lieutenant Colonel Patton also directed her noncommissioned officer to take him to the OSI interview to show Defendant how to get there.

Government's  Exhibits  INV_00000410,  INV_00000427,  INV_00000428 INV_00000429  INV_00000430  INV_00000431  INV_00000432,  INV_00000363 and similar evidence all involve an alleged confession by Defendant which is an approximate  two-and-a-half-hour  interview  by  Air  Force  Office  of  Special

Investigations ("OSI") and El Paso County Sheriff's Office; specifically OSI Agent Kristin Brandt and El Paso County Sheriff Detective Joy Moss.  This interrogation occurred on April 4, 2022.  The law enforcement agents make the bald assertion "I thanked Jose [Galiano Apaza] for coming in for the interview and told him that he was free to leave at any time and to not answer any of my questions." [INV_00000410 at 1].  Contradictorily however, the law enforcement officers state the following during the interview:

At the start of the interview, detective Moss conclusory pronounces Defendant's knowledge of English and does not give Defendant an option of having a translator.

The purpose of the interview is clearly to obtain a confession from Defendant.   The interview starts out with rapport building between the law enforcement officers and Defendant.  [INV_00000363-77].  After rapport building, the law enforcement officers ask Defendant questions he does not want to answer but the law enforcement coerce him into answering the questions:

> Moss:  Yeah, texting like that a lot for sure.  Um, and so then - - let's see.  So you guys - - were you guys ever intimate together?
>
> GALIANO:  No, I don't want to share that.
>
> Moss:  Okay.  Um, and how about - - tell me about then when you guys kinda stopped dating, happened then?
>
> GALIANO:  Uh, I don't wanna have to share that either, sorry.
>
> Moss:  Okay.  Okay, so let me tell you a little bit of what I know okay - -
>
> GALIANO:  Okay.

Moss: - - and then maybe you can tell me if that's right or wrong.  Is that fair?

GALIANO:  Uh-huh.

[INV_00000380].

Moss:  Yeah.  No, that's fine.  And just tell me if - - if I have something wrong too, just tell me.  I'm just trying to verify to make sure that I do have it correct.  Um, 'cause that's my understanding, you know, from talking to everyone.

GALIANO:  Yeah, but I - - even if I had something wrong like I don't wanna talk about it.

Moss:  Okay.  And when you say you don't wanna talk about it you mean like - -

GALIANO:  I don't wanna - -

Moss:  - - the break up or - -

GALIANO:  Or - - or what - -

Moss:  The breakup

(Crosstalk)

GALIANO:  No, no.  If there is something wrong like, it's - - I - - I don't wanna - - I (inaudible – 00:24:14), uh, I just don't wanna say anything that I - - that I pro - - probably in the future can be misunderstood.

Moss:  Okay, yeah.  And - - and like I said, I don't want you to feel like I'm misunderstanding you at all, okay.  Um, I'm just kinda telling you - - walking you through what I know - -

GALIANO:  Okay.

Moss:  Um, so my understanding is - - is after the breakup, um, you were upset and rightly so, right.  I mean breakups are not fun for anyone whatsoever especially, um, like I said I know - - I know that you guys were very much in love. Um, my understanding is that through after the breakup, um, you know, things got a little bit more tense with her.  Um, I know that there were some questions of is she was stating to someone else, I um, and you know, that was, you know, devastating for your to hear.  Um, and my understanding is

4

Case 1:22-cr-00208-RMR   Document 26   Filed 10/24/22   USDC Colorado   Page 5 of 21

that you had then, um, confided in your roommate, um, about a situation that had happened with her, um right after basic. Um, and, my understanding of that situation was that you guys were, you know, just kind of getting out of that friend zone, um, into more of a relationship standpoint, um and one of the occasions, um, you guys began to have sex. Um, at one point it became painful for Zia, um, and she told you to stop and instead of stopping you continued. Um, and when you confided in roommate about this, um, it didn't necessarily come out right then, um, but she ended up, um, you know, not sure what to do with that situation and, um, so then it ended getting reported back to us. Um, and so that's ultimately why we're here today is to kind of hear from your perspective, you know, what happened in that situation, um and, you know, hear from you.

GALIANO: I don't wanna say about like - - I don't wanna talk anything about it (inaudible – 00:27:18). I don't know if you (inaudible – 00:27:24) trying to - - what I mean like, um, I don't wanna - - I don't' wanna say anything about it.

Brandt: We know it's hard to talk about - -

GALIANO: Uh-huh.

Brandt: - - when you know especially with how long you guys were together and, you know the feelings that all - -

[INV_00000381-82].

Even though Defendant *clearly* stated he did not want to talk about the situation where Defendant and Alleged Victim first had sex, the two law enforcement officers then used common interrogation techniques to pry the statement out of him anyway. They use technique include statements from the law enforcement officers such as: "hearing it from you who was present at the time puts a lot of weight over the rumors that people have been hearing . . . I do think you were remorseful about what happened and I do feel like it has been weighing on you . . . an opportunity to have - - to that that off your chest . . . [w]hat happened from your perspective . . . [opportunity] to take accountability for what happened. .

. . I think Zia deserves an apology as well . . . is she lying when she says that she told you to stop and you continued to have sex with her? . . . [w]hen you say, you know, I don't want wanna say anything essentially that's saying well that either means Zia's lying, right, or we don't have the whole truth? . . . I just wanna know from your perspective what happened." [INV_00000382-85].

Even after all of the aforementioned confession techniques, Defendant clearly stated:

> GALIANO:  And I - - and I don't - - I - - both and I don't (inaudible –
> 00:45:04), uh, that's why I - - I didn't want to talk about it.

[INV_00000385].

Nevertheless, the law enforcement officers vigorously persist:  "Um, and, you know, she said that you had told her as well about what had happened between you and Zia and, um, you know, she said that you definitely did feel sad about what had happened and, um, felt, you know, kind guilty about the situation. . . . And, you know, I don't think, you know, Angie's lying about what she told us either. . . . I don't think you're a bad person. . . . I don't - - I think that you did hurt Zia. I don't necessarily thin that you intended to. . . . the entire time you were here and was always there for you. Be there for her now. This is your chance to - - I know she's not here, but this is your chance to tell her about the night. To tell her that it was a mistake and that you do feel sorry . . . She wants you to be brave and tell her so that she doesn't think that she's crazy and that all men are evil. And she'll be able to still have a normal life with someone. You're her rock. You're that person for her. Show her you're still that person."

[INV_00000385-89].

Then the following astounding conversation takes place; even in light of the

law enforcement officers claim that the conversation was non-custodial:

> Brandt:  And so, whatever you tell us here, she's - - she's gonna hear it and she'll be about to finally hear it from you.  We're not just gonna keep this to ourselves.  We're here for her.

> GALIANO:   I don't' know, I - - I - - I talked to  - - *I talked to uh, a lawyer,* and the not to answer things because I can compromise myself.

> Brandt:  Was that the ADC?

> GALIANO:   Yeah, And that's why I don't wanna say anything because I don't wanna compromise myself saying so many - - I want to help her like I wanna do that.

> Brandt:  I believe you.  I believe you want to help her and I know it's a tough spot for you.
>                          *          *          *
> Brandt:  We know what happened in that room, that night.  But what's so important here is your thoughts.  Because we don't think your're a person.  We don't think it was malicious, we don't think you were you know, and I'm gonna hurt ZIA tonight.   That's not what happened.  Right?  Right?  You wanted to show your love for her.  So, being intimate is a way that you do that.  And one thing she wanted to hear is the reason why.  The apology and the why.  Why did it happen?  Why is she still going through this?  She doesn't have those answers because there's only one person that can come from and that's you.
>                          *          *          *
> Moss:  Did you hear her say "stop?"
>                          *          *          *
> Brandt:  JOSE, can I ask you one question before - - thin it'd be good if you wanna take a little break.

> GALIANO:  Yeah, I'm kinda like - -

> Brandt:   Uh, can I ask you one question to make sure we have it correct, okay?

> GALIANO:  Okay.

Brandt:  So, I know you aid that you did hear her say "stop" - - did you continue having sex with her after she said "stop?"

GALIANO:  I - - I think my side of this story is not important right now, because you care about Zia and it affected her and she's –
Moss:  We care about you too.

[the law enforcement officers then repeatedly attempt to get Defendant to answer the question over 6 pages of transcript which Defendant resists].

GALIANO:  If I decide not to answer that question, I guess something bad is going to happen.

Brandt:  *It is*.  You are allowed to decide whether or not you wanna answer that question.  The reasons why I asked it is because we know that you heard her say stop.  And it while it was while you guys were having sex.  We know that.  You said it.

*          *          *

Moss:  Um, JOSE, do you think should there be consequences for what happened that night?

*          *          *

Brandt:  So, I'm going to ask you three mental health questions, um, *and after that, you are free to - - finish your day*.  Um, I'll tell you though, because I know it was such a difficult conversation, I'm going to let your leadership know that you're done, and they'll probably check in on you, okay?  Just to make sure you are doing okay.  (

[INV_00000381-403] (emphasis added).

### III.  LEGAL FRAMEWORK

"We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his

rights and the exercise of those rights must be fully honored." *Miranda v. Arizona*,

384 U.S. 436, 467 (1966).

The determination of custody for purposes of *Miranda* in this Circuit is as

follows:

> Whether a suspect is in custody represents an objective determination. *See generally* 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.6(c) (3d ed. 2007) [*Criminal Procedure* ]. "We therefore must determine whether 'a reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.' " *Chee,* 514 F.3d at 1112 (quoting *Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138) (internal brackets and ellipsis removed).
>
> \*        \*        \*
>
> "The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive." [U.S. v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993)]. (thus avoid hard line rules and instead allow several non-exhaustive factors to guide us. First, we consider "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will." *Id.* Second, we look at "the nature of questioning," where "prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave." *Id.* Finally, by using the following helpful guideposts, we check whether police dominate the encounter:
>
>> [S]eparation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.
>
> *Id.* at 1518–19.  Although these factors are useful, we emphasize that we must look to the totality of the circumstances and consider the police-citizen encounter as a whole, rather than picking some facts and ignoring others.

*U.S. v. Jones*, 523 F.3d 1235, 1239-40 (10th Cir. 2008).

## IV.  ARGUMENT

Defendant's interrogation was custodial.  According to Agent Brandt and Detective Moss, the aforementioned interview and alleged confession of Defendant "Miranda was not advised, as this was a non-custodial interview." [INV_00000410 at 1].  Agents Brand and Detective Moss are wrong.

Defendant was essentially directed by his commanding officer to attend the interview with OSI - - he did not have any real choice.  In the military and USAFA context, by recommending to Defendant that Defendant go to the OSI interview, his commanding officer effectually directed Defendant to go to the interview.  The direction by a commanding officer to interview with a high-level investigative authority, OSI, is akin to an arrest.  After an arrest, such an interview is commonplace.

The two-and-a-half-hour interview under the totality of the circumstances clearly indicates that Defendant was not free to leave.  Even though the law enforcement officers stated Defendant was free to leave at any time and that he did not have to answer any questions, the circumstances the law enforcement officers created contradict that lone assertion that Defendant was free to leave and to refuse to answer questions.

First, as a matter of fact, as noted above, Defendant did refuse to answer questions; however, instead of refraining from asking the question, the law enforcement officers used techniques to make him answer the question anyway:

> Moss:  Yeah, texting like that a lot for sure.  Um, and so then - - let's see.  So you guys - - were you guys ever intimate together?
>
> GALIANO:  No, I don't want to share that.

Moss:  Okay.  Um, and how about - - tell me about then when you guys kinda stopped dating, happened then?

GALIANO:  Uh, I don't wanna have to share that either, sorry.

Moss:  Okay.  Okay, so let me tell you a little bit of what I know okay - -

GALIANO:  Okay.

                              *          *          *

Moss:  Yeah.  No, that's fine.  And just tell me if - - if I have something wrong too, just tell me.  I'm just trying to verify to make sure that I do have it correct.  Um, 'cause that's my understanding, you know, from talking to everyone.

GALIANO:  Yeah, but I - - even if I had something wrong like I don't wanna talk about it.

Moss:  Okay.  And when you say you don't wanna talk about it you mean like - -

GALIANO:  I don't wanna - -

Moss:  - - the break up or - -

GALIANO:  Or - - or what - -

Moss:  The breakup

(Crosstalk)

GALIANO:  No, no.  If there is something wrong like, it's - - I - - I don't wanna - - I (inaudible – 00:24:14), uh, I just don't wanna say anything that I - - that I pro - - probably in the future can be misunderstood.

Moss:  Okay, yeah.  And - - and like I said, I don't want you to feel like I'm misunderstanding you at all, okay.  Um, I'm just kinda telling you - - walking you through what I know - -

Brandt:  - - when you know especially with how long you guys were together and, you know the feelings that's all - -

[INV_00000381-82].

This questioning clearly indicates that Defendant did not want to answer any questions regarding Defendant's intimate conduct with alleged victim or the end or their relationship as Defendant does not want to be misunderstood. The law enforcements clearly ignore Defendant's refusal to answer questions, contradicting their assertion that Defendant did not have to answer any questions. The law enforcement officers persist even further:

Law Enforcement Officers: "hearing it from you who was present at the time puts a lot of weight over the rumors that people have been hearing . . . I do think you were remorseful about what happened and I do feel like it has been weighing on you . . . an opportunity to have - - to that that off your chest . . . [w]hat happened from your perspective . . . [opportunity] to take accountability for what happened. . . . I think Zia deserves an apology as well . . . is she lying when she says that she told you to stop and you continued to have sex with her? . . . [w]hen you say, you know, I don't want wanna say anything essentially that's saying well that either means Zia's lying, right, or we don't have the whole truth? . . . I just wanna know from your perspective what happened."

> GALIANO:  And I - - and I don't - - I - - both and I don't (inaudible – 00:45:04), uh, that's why I - - I didn't want to talk about it.

[INV_00000385].

Nevertheless, the law enforcement officers vigorously persist:  "Um, and, you know, she said that you had told her as well about what had happened between you and Zia and, um, you know, she said that you definitely did feel sad about what had happened and, um, felt, you know, kind guilty about the situation. . . . And, you know, I don't think, you know, Angie's lying about what she told us

either. . . . I don't think you're a bad person. . . .  I don't - - I think that you did hurt Zia.  I don't necessarily thin that you intended to. . . .  the entire time you were here and was always there for you.  Be there for her now.  This is your chance to - - I know she's not here, but this is your chance to tell her about the night.  To tell her that it was a mistake and that you do feel sorry . . . She wants you to be brave and tell her so that she doesn't think that she's crazy and that all men are evil.  And she'll be able to still have a normal life with someone.  You're her rock.  You're that person for her.  Show her you're still that person."  [INV_00000385-89].

These statements are unmistakably coercion by the law enforcement officers to get Defendant to answer questions Defendant did not want to answer. The law enforcement officers continue to persist:

> Brandt:  And so, whatever you tell us here, she's - - she's gonna hear it and she'll be about to finally hear it from you.  We're not just gonna keep this to ourselves.  We're here for her.
>
> GALIANO:  I don't' know, I - - I - - I talked to  - - I talked to uh, a lawyer, and the not to answer things because I can compromise myself.
>
> Brandt:  Was that the ADC?
>
> GALIANO:  Yeah, And that's why I don't wanna say anything because I don't wanna compromise myself saying so many - - I want to help her like I wanna do that.
>
> Brandt:  I believe you.  I believe you want to help her and I know it's a tough spot for you.

[INV_00000831].

Here, the law enforcement officers continue to try to get Defendant to answer questions he does not want to answer even though Defendant states he

does not want to answer questions to "compromise myself" as an attorney told him

not to do.  The law enforcement officers continue:

> Brandt:  We know what happened in that room, that night.  But what's so important here is your thoughts.  Because we don't think your're a person.  We don't think it was malicious, we don't think you were you know, and I'm gonna hurt ZIA tonight.   That's not what happened.  Right?  Right?  You wanted to show your love for her. So, being intimate is a way that you do that.  And one thing she wanted to hear is the reason why.  The apology and the why.  Why did it happen?  Why is she still going through this?  She doesn't have those answers because there's only one person that can come from and that's you.
>
> *          *          *
>
> Brandt:  JOSE, can I ask you one question before - - thin it'd be good if you wanna take a little break.
>
> GALIANO:  Yeah, I'm kinda like - -
>
> Brandt:  Uh, can I ask you one question to make sure we have it correct, okay?
>
> GALIANO:  Okay.
>
> Brandt:  So, I know you said that you did hear her say "stop" - - did you continue having sex with her after she said "stop?"
>
> GALIANO:  I - - I think my side of this story is not important right now, because you care about Zia and it affected her and she's –
> Moss:  We care about you too.

[INV_00000403].

Here the law enforcement officers are not only again trying to get Defendant

to answer a question he does not want to answer; but they are not allowing him to

take a break until he answers their question to incriminate himself which

completely contradicts the law enforcement officer's initial assertion that he was

free to leave at any time.

Next, the law enforcement officers then repeatedly attempt to get Defendant to answer the question over 6 pages of transcript.  Then, Defendant states as follows:

> GALIANO:  If I decide not to answer that question, I guess something bad is going to happen.
>
> Brandt:  *It is*.  You are allowed to decide whether or not you wanna answer that question.  The reasons why I asked it is because we know that you heard her say stop.  And it while it was while you guys were having sex.  We know that.  You said it. (emphasis added).

[INV_00000403] (emphasis added).

It is axiomatic here that if Defendant does not answer SA Brandt's question, something bad is going to happen to Defendant.  This *is* coercion and Defendant clearly does not have a choice whether to answer her question.

SA Brandt then goes on to admit that Defendant was never free to leave as she states:

> Brandt:  So, I'm going to ask you three mental health questions, um, *and after that, you are free to - - finish your day*.  Um, I'll tell you though, because I know it was such a difficult conversation, I'm going to let your leadership know that you're done, and they'll probably check in on you, okay?  Just to make sure you are doing okay.

[*Id.*] (emphasis added).

Second, the nature of questioning by the law enforcement officers was prolonged and accusatory which created a coercive environment where Defendant did not feel free to leave.  The interview was prolonged as it was two and a half hours long.  The law enforcement officers were clearly accusatory throughout the interview.  The law enforcement officers stated to Defendant:

Moss:  Um, at one point it became painful for Zia, um, and she told you to stop and instead of stopping you continued.

This statement accuses Defendant of committing the charged crime as it accuses him of continuing sex even though alleged victim told him to stop.  The law enforcement officers continue:

Law Enforcement Officers:  hearing it from you who was present at the time puts a lot of weight over the rumors that people have been hearing . . . I do think you were remorseful about what happened and I do feel like it has been weighing on you . . . an opportunity to have - - to that that off your chest . . . [w]hat happened from your perspective . . . [opportunity] to take accountability for what happened. . . . I think Zia deserves an apology as well . . . is she lying when she says that she told you to stop and you continued to have sex with her? . . .  [w]hen you say, you know, I don't want wanna say anything essentially that's saying well that either means Zia's lying, right, or we don't have the whole truth? . . .  I just wanna know from your perspective what happened."

[INV_00000382-85].

This statement also accuses Defendant of committing the charged crime and demands Defendant's apology.  The law enforcement officers continue:

> Brandt:  We know what happened in that room, that night.  But what's so important here is your thoughts.  Because we don't think your're a person.  We don't think it was malicious, we don't think you were you know, and I'm gonna hurt ZIA tonight.   That's not what happened.  Right?  Right?  You wanted to show your love for her.  So, being intimate is a way that you do that.  And one thing she wanted to hear is the reason why.  The apology and the why.  Why did it happen?  Why is she still going through this?  She doesn't have those answers because there's only one person that can come from and that's you.

*       *       *

Moss:  Did you hear her say "stop?"

[INV 00000389-90].

These statements by the law enforcement officers accusatory on their face.

The law enforcement officers continue:

Brandt:  So, I know you said that you did hear her say "stop" - - did you continue having sex with her after she said "stop?"

[INV_000000393].

All of the above statement by the law enforcement officers is clearly accusatory.  They are accusatory that alleged victim stated "stop" the sex and that Defendant continued anyway - - the basis for the accused crime.   The law enforcement officers continue:

Moss:  Um, JOSE, do you think should there be consequences for what happened that night?

[INV_00000401].

Not only is this statement accusatory, but it asks Defendant if he believes he should be punished.

Third, the interview room was separated from everyone and contained only defendant, Agent Brand and Detective Moss.  He was in an area separate from family or collogues who could offer moral support and isolated in a nonpublic questioning room under the threatening presence of two law enforcement officers who outnumbered him two to one.

The officer's use of language and tone of voice throughout the interview in a manner implying that compliance with the requested questions were compelled. *See generally* [INV_00000427, INV_00000428, INV_00000429, INV_00000430,

INV_00000431, INV_00000432].  As noted above, Defendant clearly stated to the law enforcement officers that he did not want to answer certain questions; however, the law enforcement continued to try to get him to answer the questions vigorously using various interrogation techniques even though Defendant repeatedly refused to answer the questions.  Ultimately, the law enforcement made him answer the questions by tricking Defendant with their techniques.  This process of deception was exasperated with Defendant's lack of fluency in English, which the law enforcement officers determined in a conclusory manner, and Defendant's difficulty expressing himself generally in any language.  As the psychiatric examination stated on this point:

> His interaction with the interviewers in April 2022 suggests he has not gained complete fluency in English.  He evidenced difficulty with comprehension when complex language was used during the interview.   For example, he was questioned about whether he felt remorse.  The interviewers indicate they are asking him whether he had remorse about the alleged sexual assault.  He appeared to misunderstand the intent of the question and responded that he regretted the loss of Ms. Kim rather than whether he had remorse about what he allegedly did to Ms. Kim.  The interviewers questioned him about his awareness of Ms. Kim's pain, which he interpreted to mean pain with her menstrual cycles.

> My evaluation of Mr. Galiano was conducted in Spanish using a professional interpreter.   There were times I had difficulty ascertaining what Mr. Galiano was trying to communicate, despite his speaking in his native tongue.  It is unclear to me whether this difficulty resulted from differences in the dialect of Spanish spoken by the interpreter versus Mr. Galiano or because of some other language problem.  What did seem clear is that if Mr. Galiano has any difficulty communicating in Spanish, he probably also has difficulty communicating in English.

> The issue at hand is what Mr. Galiano understood at the time of the alleged sexual assault in about August 2020.  His account regarding what transpired the night in question is at odds with what Ms. Kim

reported.  There were no witnesses to what occurred other than the two of them.

Mr. Galiano reported he took care and made efforts to ascertain the well-being of Ms. Kim when they first engaged in sexual intercourse. He denied she said anything or acted in a manner that suggested she wanted to stop or was experiencing pain.  He believed they were engaging in consensual sex the entire tine they engaged in sex.

He reported he was unaware of her perception that she had been raped by him until four months after the event occurred.  He estimated they engaged in sex four times a week during those four months and after she alleged he had raped her the first time they had sex.  He reported he only made her accusations against him when she was angry with him.  He stated the force and frequency of her accusations made him start to think that maybe her allegations were true.

It is not unusual for someone who is introspective and capable of insight to seriously consider the veracity of accusations made by a trusted and loved person.  Mr. Galiano described Ms. Kim as someone who went out of her way to help him when he arrived in the United States and a person he came to love and fully trust.  There is no indication from him or others that he was observed treating her in an abusive or disrespectful manner during the time they were romantically involved.  Ms. Kim described Mr. Galiano as being controlling, but Mr. Ritchot described her as being "very vehement about her beliefs" and indicates he thought her actions towards Mr. Galiano were emotionally abusive.

Mr. Galiano's limited knowledge of English and his possible difficulties communicating in Spanish support the possibility he miscommunicated what he knew and did at the time of the alleged sexual assault.  It seems quite possible he did not fully understand the meaning or import of what he was heard to say in English.  It is quite possible that what he was heard to say did not accurately represent what he believes occurred

[Psychiatrist's Report[2] at 16-17].

---

[2] "Psychiatrist's Report" is a psychiatric report conducted on Defendant on June 3, 2022, by Karen V. Fukutaki, M.D. which is attached hereto.  Her report analyzes statements by defendant during the interview this motion seeks to suppress and Defendant also seeks to suppress that portion of the psychiatric report.

All of these factors clearly indicate that Defendant's interrogation by law enforcement officers was custodial.  Their initial comments that Defendant was free to not answer questions and was free to leave is completely contradicted by their words and actions - - their initial comments are unavailing.

## V.  CONCLUSION

WHEREFORE, Defendant Jose Galiano Apaza respectfully moves this Honorable Court to suppress Government's Exhibits INV_00000410, INV_00000427, INV_00000428, INV_00000429, INV_00000430, INV_00000431 INV_00000432, INV_00000363-409, similar evidence, evidence referring to that evidence, evidence deriving from that evidence, and any testimony regarding the aforementioned evidence.

Respectfully submitted this 24th day of October, 2022.

**SCABAVEA & ASSOCIATES, LLC**

s/ Mark E. Scabavea
MARK EDWARD SCABAVEA
301 Sheridan Blvd.
Lakewood, Colorado 80226
Office:  (720) 646-7970
scabaveallc@icloud.com
*Attorney for Defendant*

## **CERTIFICATE OF SERVICE (CM/ECF)**

      I hereby certify that on October 24, 2022, I electronically filed the foregoing Motion to Suppress with the Clerk of the Court using the CM/ECF system and/or electronic mail, which will send electronic notification to all the parties.

Thomas Misner
Thomas.Minser@usdoj.gov

Al Buchman
A.Buchman@usdoj.gov

                                  s/ Mark E. Scabavea
                                  MARK EDWARD SCABAVEA
                                  301 Sheridan Blvd.
                                  Lakewood, Colorado 80226
                                  Office: (720) 646-7970
                                  scabaveallc@icloud.com